UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THOMAS DAVIDSON, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>APPLE, INC.,<br><br>　　　　Defendant. | Case No. 5:16-cv-04942-LHK (HRL)<br><br>**ORDER RE DISCOVERY DISPUTE JOINT REPORT NO. 1**<br><br>Re: Dkt. No. 129 |

This is a putative consumer class action against Apple alleging that its iPhone 6 and iPhone 6 Plus ("iPhones") are defective. The alleged defect manifests itself when a user's touch or swipe on the touchscreen brings no response from the iPhone. Plaintiffs say that two touchscreen controller chips ("touch IC chips") underneath the touchscreen convert touches of the user into instructions to the iPhone software to do what the user is ordering. Allegedly, through poor design, insufficient padding, or weak external casing, in normal use the solder joints of the touch IC chips become loose, and the electrical connectivity between the chips and the motherboard to which they are attached is interrupted. Result: the instructions the touches generate do not get transmitted to the software, and nothing happens. Plaintiffs claim that countless iPhone users have had this problem. Apple, apparently, attributes the failures to rough handling or carelessness by users.

No one disputes that Apple should be allowed to test the plaintiffs' iPhones. However, Discovery Dispute Joint Report #1 ("DDJR #1") arises because the parties cannot agree on a protocol that Apple must follow in doing so. They did agree on designating a neutral expert to run the tests (including any tests that the plaintiffs wanted). They hung up on three issues and came to the court to sort them out.

First, the plaintiffs were concerned about maintaining the privacy of any user-created content on an iPhone. Apple addressed that concern by offering to allow plaintiffs to restore each iPhone to its factory default settings, which (they say) would wipe out all user-created content. Alternatively, Apple agreed that it would not look at any user-created content. Apparently, this issue has by now been resolved, since the plaintiffs do not cite it as a sticking point in DDJR #1, and it was not discussed at the November 8th hearing the court held with both lead counsel.

Second, the plaintiffs are concerned about the possibility of destructive testing. They do not want their iPhones to be damaged, altered, or destroyed while undergoing Apple's tests. Apple tries to assuage those concerns by representing that it will do no destructive testing. This attempt at reassurance does not succeed because Apple refuses to describe what tests it plans to have the neutral expert run. That raises real concerns. Should Apple alone be the "decider" of whether a particular test is destructive? Suppose it is mistaken? Suppose the neutral expert does not know if a test is destructive or not? How would the plaintiffs, or the court, know if some data is altered, perhaps unwittingly or unknowingly, as a consequence of one of the tests? Apple's promise is that its testing will not "permanently alter the physical appearance or functionality of the iPhones." There are holes in that promise, such as how about data alteration (or deletion, or even addition) that does not change "functionality"? Based on that promise, the court simply does not have confidence that the iPhones after Apple's tests are going to be returned in exactly the same state they were in when turned over to the expert.

The court's concern is exacerbated by Apple's insistence that disclosing what tests it intends to run would disclose its attorney's work product. That is, disclosing the tests, whatever they might be, would reveal counsel's strategy for defending the lawsuit. This court has no background in smart phone technology or testing, but this assertion is hard to fully accept. How is

2

the court to know whether or not disclosing the tests would tip off plaintiffs to some area of inquiry they would not have thought of otherwise? The only good safeguard, other than just taking Apple's word for it, or hoping the expert will recognize destructive testing and refuse to do it, is to tell the plaintiffs what the tests are going to be and give them the opportunity to object.

The third issue, which overlaps the second, is the thorniest. Should plaintiffs receive the data or information obtained from the iPhones on account of Apple's tests? The court is not sure what tests the plaintiffs might wish to run, if any, but their request is that both sides simultaneously receive the data from both side's tests. Apple vigorously opposes that proposition.

One way of looking at it is that the data coming out of the iPhones in testing is just that, data, which is nothing more than factual. Indeed, that data or information "belongs" to the plaintiffs, so why should they not have it? The court envisions that the information derived from the tests would be distinguishable from the conclusions someone might draw from analysis of the information.

Basically, plaintiffs are concerned that if Apple gets to run tests it does not have to describe in advance, and if it gets sole custody of its test results, then it can use the test results that favor the defense and ignore results that support plaintiffs' case. Plaintiffs are especially concerned that Apple has some tool or software program that no one else has to run diagnostics on the iPhone. After all, this product is not like a tire, or hair dryer, or power tool; it is an extremely complicated, sophisticated, multi-purpose instrument with a closed architecture shrouded in an aura of mystery. Could one reasonably speculate that Apple can get diagnostic information out of an iPhone that no one else could get? Plaintiffs certainly think it could.

True, Apple's counsel did represent to the court that it would not use any "proprietary" test, or tool. It would only use "common" tests available in the marketplace. Counsel, however, declined to identify *any* proprietary test and even declined to name *any* common test that Apple might employ on plaintiffs' iPhones. He said that plaintiffs could run any of the tests that Apple plans to run, but would not say what they were, repeatedly citing the work product doctrine as the basis for his refusals.

Defense counsel said that Apple did want to power up the iPhones, but would not have the

3

expert open their cases or connect them to a computer.  He also disclaimed any intent to do any of the tests that plaintiffs' counsel suggested were possible:  Apple would not access the "software," nor the "meson" chip (whatever that is), and there simply was no accelerometer sensor.  Much time was spent at the hearing listening to defense counsel saying what Apple was *not* going to do, but almost nothing on what it *was* going to do (other than to acknowledge that its goal was to find out whether the phones had been dropped).

The court has read all of the cases cited by Apple and the plaintiffs.  None are controlling and none are directly on point.  Only *Galitski v. Samsung Telcoms. Am., LLC*, No. 3:12-cv-4782, 2014 U.S. Dist. LEXIS 99199 (N.D. Tex., July 22, 2014), involved a smart phone, and the court's concern there was not about work product protection but about insuring the non-destructive testing really was going to be non-destructive.  Interestingly, in that case Samsung agreed that plaintiffs' representative could be present during the testing, and the court required Samsung to give to plaintiffs' counsel a "reasonably specific description of the tests to be performed and the procedures to be followed" so that they would have the ability to challenge a test as destructive.

The court is not persuaded that the plaintiffs' attorneys are quite as unclear about the ins and outs of smart phone testing as they seem to let on.  But, their fears of data destruction and their concerns about Apple taking unfair advantage of its opportunity to test their iPhones are not to be dismissed lightly. There is little doubt that Apple knows lots about it and is not going out of its way to explain it.  On the other hand, the court does appreciate, as Apple has pointed out, that it is not Apple's job to make plaintiffs' case.  However, Apple has not satisfied the court that allowing secret testing will assure no data is destroyed or altered or deleted.  And, Apple's counsel was so very careful in his choice of words responding to the court's probing questions about testing that he left the court feeling it was not getting a full picture.  In the present situation, the court is inclined to come down on the side of disclosure.

The court is not convinced that the work product doctrine is implicated in the testing of plaintiffs' iPhones.  What the parties *do* with the results is probably work product, but what comes "out" of those instruments is just data or information.  If the court is wrong, and it is deemed work product, then work product protection, which is not absolute, should give way to the exception in

4

Fed. R. Civ. P. 26(b)(3)(A)(ii), because the court believes plaintiffs have a substantial need for the information to prepare their case and likely cannot get it by other means. Plaintiffs shall arrange forthwith for delivery of their iPhones to the neutral expert. At least 48 hours before testing is to commence, both sides will simultaneously identify and describe with particularity to the other side each test they want to be run, which will give the other side the opportunity to object that a certain test may be destructive. Any test objected to shall not be run until the parties agree or the court orders it. All test results shall be given to both sides. Any test not objected to may be run. The neutral expert will agree to be bound by the protocol and keep all communications with each party's attorneys confidential, not to be disclosed to the other side.

If an appeal is taken from this order, the order is stayed until the appeal is resolved.

SO ORDERED.

Dated: December 14, 2017

HOWARD R. LLOYD
United States Magistrate Judge